Hopefully that's clear enough, and with that, well, I guess who, which council is going to start? I have your honor. And you're Mr. Sprankling? Thomas Sprankling from Ms. Yang. So go ahead and let us know your name, who you're representing, and how much time you plan to reserve for rebuttal. Yes, your honor, Thomas Sprankling from Ms. Yang, and I'll endeavor to reserve one minute. Your honors, the government's primary theory for mail fraud below was a fraud on the government theory. That is that Ms. Yang made false statements on certain immigration-related forms. That case would not state a claim for mail fraud under the Miller Standard, which requires both an intent to deceive and an intent to cheat someone out of money or property. And it certainly would not constitute facilitation of a crime beyond immigration fraud under the sentencing guideline 2L21B3. Counsel, let's turn to the sentencing guideline. Why isn't this invited error? Yes, your honor, you're referring to the government's waiver argument? Well, I'm referring to the fact that you briefed and told Judge Koh that you wanted it brought under the immigration provision and not under the fraud provision. And now you're up here telling us that it's wrong, and Judge Koh said, I don't think that's the right provision. But in order to simplify things on appeal, which apparently it did not do, you're here now arguing precisely the opposite of what you told Judge Koh to do. She did exactly what you asked her to do. Your honor, respectfully, that's not quite right. If you look back to our sentencing briefing, we raised the case United States v. Wang, which is from this court. And it held expressly that when the underlying conduct states a claim for visa fraud, even if it's charged as a mail fraud offense, that constitutes that the visa fraud guidelines must apply. And, your honor, I think it's very telling that the government doesn't even mention the Wang case. Now, counsel, maybe I'm — maybe I am confused. Let's see. Okay. I've got — you're Wilmer — you're Wilmer Hale, right? That's correct, your honor. Okay. So I'm looking at Wilmer Hale's Jennifer Yang sentencing memorandum, and page 18 says 2L2.1 provides the appropriate sentencing guidelines. Is that — am I not reading that correctly? Yes, that's correct. That's the visa fraud guidelines. But didn't you tell Judge Koh that you wanted your client sentenced under 2L2? Yes, that is correct. That's not what you're arguing today. You're arguing that that's the wrong guidelines. No, no, no, your honor. Not at all. No. We're arguing that under 2L2 is the correct basic guidelines. But within that, there are enhancements. And we're talking specifically about the — You want the four-level enhancement. We would like that vacated, yes, your honor. Because it doesn't involve a visa. No, your honor. The test is facilitation, not involvement. And that's the same error, unfortunately, that the government made below. The government said that this four-level enhancement applies because this case involves visas and passports. So you think that 2L2 does provide the correct guideline? Yes, your honor. Not 2B1? I mean, I hope I'm not misstating anything. But to be clear, the visa fraud guidelines are the correct guidelines. And that's the guidelines that have the enhancement that we're arguing over, the four-level enhancement. Okay. If there's a typo somewhere in our brief, I apologize. But we requested the visa fraud guidelines. When Judge Koh applied those guidelines, she also applied this four-level enhancement. We don't think the enhancement is proper. We do think that the visa fraud guidelines are correct. And we have to say that, your honor, because there's a substantial difference between mail fraud and visa fraud guidelines. It would have been a much higher sentence. So, your honor, as far as I understand, the district court's concern was that she thought that we need to take the bitter with the sweet, that if we were going to argue that visa fraud applied, then this enhancement should apply. We respectfully submit that's not correct. The requirement for the enhancement is facilitation. The government merely talked about involvement of these cases. Facilitation means to make easier to bring about. And Judge Koh offered no explanation beyond the government's. Under this court's decision in Castro-Ponce, that enough is a loan to vacate, right? The district court didn't make a required factual finding of facilitation. But, your honor, I do want to turn to our mail fraud conviction, because if we're right on that, you don't even need to reach the sentencing enhancement. Under mail fraud, the government concedes it's plain error. So the only question in front of you is the substantial rights question. And in this case, we would submit that there's a reasonable probability that the result would have been different had the court instructed on the right test under Miller. And the reason for that is, your honor, that the government's case on the misappropriation of investor funds was incredibly thin. It relied on two witnesses, one of whom, Mr. Zhang, was an investor. And even the government concedes at page 65 of their brief that the jury didn't credit him. How do we know that? Because every single count of the 10 that Ms. Yang was charged with, three of them were related to Mr. Zhang and the jury quitted on all three. That leaves just one witness for this misappropriation of funds, who is Ms. Wu. Now, Ms. Wu is a forensic accountant. She did not testify that any funds were used improperly because she was ethically prohibited from doing so. She merely traced where funds went. And there was one very glaring error in her analysis I want to make sure that this court is aware of. She didn't account for Ms. Yang's salary. So to walk you through what was about, I think, a day and a half of testimony, essentially her theory was, here is a large bucket of money. I'm going to trace where that money goes to various boxes. One box was clothing. One box was groceries. One box was hotels. There were also boxes for every employee's salary, except for Ms. Yang in some of the spreadsheets. And so what that meant is Ms. Yang, basically in terms of salary, received about $570,000 over the course of 10 years. So a fairly modest salary of $57,000 living in the Bay Area. Rather than account for that as salary, the forensic accountant moved that into other boxes. So, yes, Ms. Yang purchased clothing. She purchased groceries. But just as when I'm paid by my law firm and I go out to Whole Foods and I buy a baguette, that doesn't mean that the law firm is buying the baguette. It's my money. That's the idea. So that's all of the government's evidence. And you can tell that the government's evidence is thin because in their closing argument, the last thing they said to the jury, they told the jury, you can convict even if you don't find misappropriation of funds. That's not essential to our case. I'd like to read to you specifically from Volume 10, page 2529 of our Excerpts of Record. The government said, the primary charges in this case, the mail fraud and visa fraud charges, are based on false statements in petitions. That has nothing to do with how the money ended up being used. And then on the same page, Your Honors, the government also noted, you'll notice that none of these elements require you to find that any of the money was misused in this case. That's not an element of the crime. The government is not asking you to decide which specific expenses were used for business purposes or job creation purposes and which were not. So essentially, the government invited the jury to put aside their very thin misappropriation case and convict solely on false statements. And under Miller, Your Honors, that simply isn't enough. I think the government concedes because they didn't raise the argument in their brief that a visa is not property or money. It can't constitute the cheat people out of money or property part of the Miller test. So they have to put their whole stake now on misappropriation of funds, something that they tossed aside at trial. The last point I'd like to make on this, Your Honors, is that the reasonable probability test sounds harder than it is. As this court just mentioned in United States v. Irons earlier this year, that's at 31F 4702, a reasonable probability means, quote, sufficient to undermine confidence in the outcome. And I submit to you, Your Honors, that if the government has two theories, one of which they say to the jury, you need not consider in order to find in our favor, I think that it undermines confidence in the outcome if their primary theory goes away. Your Honors, I'd also like to turn briefly to the visa fraud issue. You know, the visa fraud statute in this case involves documents that are, in order to find visa fraud, you need to find that there are false statements and documents that are required under federal immigration law or federal immigration regulations. In this case, there is no dispute that the documents at issue, that is an I-9 form and an IRS-9 form, are not required by regulation. In fact, the regulation itself uses the word may. They are types of evidence that can be used. Yeah, but some form is required, correct? Some evidence is required, yes, of job creation. Yes. So there are types of evidence. And this form then supplied the required evidence. It was, yes, it was the evidence that was used in that case. The argument is that any time when you're allowed to give alternative forms, that none of the forms would count as would suffice for this. So it seems a little implausible. Well, respectfully, Your Honor, if Congress had wanted to say that, you know, to use that language in the statute, they could have. They used the word required. And just so you don't think there's nothing left, to give you a couple of examples. I mean, so it's a situation where something is required, but you can meet that requirement in alternative ways. And you're saying because you can meet the requirement in alternative ways, then nothing is really required. So it's hard for me to see how any reasonable person in Congress would think that, I mean, something is required here. Well, Your Honor, I do think it's time to look at the language of the regulation, right? And that's something the government has full control of. And it doesn't say that you are required to submit A, B, or C. It says that evidence may include. It doesn't even mention the IRS 941 forms. But you're required to submit evidence. Yes, you are required to submit evidence. And this is evidence. You can do things alternatively. So do you have authority for your position that I'm characterizing as sort of wipes out any time you can provide alternative? No, because, frankly, it's a novel issue. I think it's, frankly, telling that it hasn't come up before because the language of the statute is fairly clear. Well, it's telling one way or the other. Respectfully, Your Honor, to be clear, there was one witness who testified on these issues, Ms. Serapu. And she did testify that one form was, quote, absolutely required, and that was the business plan. Her testimony did not make a similar statement about I-9 forms or IRS 941 forms. What she said instead was that they were commonly used, they were generally used. And we would respectfully submit, Your Honor, that commonly and generally is not the same thing as required. Your Honor, I have 10 seconds left. We'll give you a minute. Okay, thank you. Good morning, Your Honors. May it please the Court, Alyssa Bell on behalf of Daniel Wu. And I'd like to reserve one minute, if possible, for rebuttal. Your Honors, I'd like to pick up where co-counsel began with the facilitation enhancement issue and explain why it was an abuse of discretion for the district court to apply this enhancement at Mr. Wu's sentencing hearing. I'd like to highlight first that we do not have a waiver issue. There's no question of preservation of this argument before the court. Your Honor, 2L2.1 punishes separately two courses of conduct. One would be visa fraud for the purposes of acquiring a visa. And the other would be visa fraud for the purpose of some collateral offense, for the purpose of facilitating a wholly separate crime. And I think an example here is helpful and illustrative. And I would point the Court to the 11th Circuit's decision in United States v. Polar. Now, in that case, the defendant possessed a false ADIT stamp that allowed him to make falsified passports. He sold those false passports to undocumented persons, knowing that those undocumented persons would present those passports to the Social Security Administration. And so in creating these false passports, he knew, had reason to believe, that the purpose of these persons to whom he would be providing the passports was to perpetrate fraud on the Social Security Administration. So that was a wholly separate non-immigration felony offense that his conduct went to facilitate. The corollary here, I would submit, would be if Mr. Wu had assisted the investors in obtaining EB-5 visas in order to facilitate their commission of a separate offense, such as alien smuggling, a terrorism offense, marriage fraud, etc. But that plainly didn't occur here. The purpose of the scheme of which Mr. Wu was convicted was to obtain EB-5 visas. And that is, it falls into the first category under the guidelines, a visa fraud for the purposes of obtaining a visa and not for some collateral purpose. And under this Court's precedence, it was therefore impermissible double-counting to essentially punish Mr. Wu's core offense conduct twice over. Once, through application of the guideline itself, and then twice, with this four-level enhancement, for conduct that was already encompassed within the guideline itself. If the Court has no questions about that, I will turn next, with the Court's indulgence, to our statute of limitations issues. I'd like to begin with the improper sealing issue. And, Your Honors, there is a point of agreement among the parties here. And that is that the government must have a legitimate prosecutorial objective for moving to seal an indictment. And the government may not move to seal an indictment to afford itself more time to investigate its case. There must be a real and legitimate need for secrecy. Let me ask you this to make sure I understand the course of the argument. If there was a legitimate need to seal, the statute of limitation argument goes away. So this entire argument hinges upon the legitimate need to seal. That's exactly correct, Your Honor. We would submit from this Court's precedent in Bracey that there are essentially three categories that can be extrapolated for when there is a legitimate need to seal, when there is a legitimate need for secrecy. The first one of those would be when the safety of victims or witnesses would be in jeopardy from revelation of the government's investigation. The second would be when the criminal enterprise that's under investigation remains ongoing. So revelation of the fact of the investigation would lead to spoilation of evidence. And the third would be when there is a risk of the defendant's flight. And we submit that none of those justifications existed in this case. The government moved to seal in order to continue investigating whether the investors were co-conspirators. What they did over a 15-month period of sealing was to serve grand jury subpoenas on several financial institutions and to spend the time reviewing the grand jury returns that they had gotten from financial institutions and returns on the new subpoenas that they issued. And they also looked through the digital devices that they had seized sometime prior from Mr. Wu and Ms. Yang. This was a highly voluminous amount of evidence, and it took them some time to get through it. And then they had to conduct a tracing analysis in order to figure out exactly where the funds had gone. So, again, a very time-consuming endeavor, but one that did not require secrecy in any respect. There was nothing about revealing the fact that the government was looking through these records that would have jeopardized the safety of witnesses. The course of conduct has long since stopped. There was no ongoing criminal conduct that needed to be stopped in its tracks. And there was no real risk of flight here. I think most telling is that the government asked Mr. Wu to self-surrender when the indictment was made public. So the government even subjectively did not believe that Mr. Wu was a flight risk. And the district court below did not even consider the pertinent factors for flight risk as to Mr. Wu. He had no ties to foreign jurisdictions. He was a man of relatively humble means. His salary was $18,000 a year. His wife was a member of the United States Armed Forces. His son was here. There really was no risk of flight, and, frankly, the district court did not identify any as to Mr. Wu. Instead, she relied on the case agent's declaration, which put forth facts that in a wholly separate case with no connection to this one, defendants had fled upon revelation of the investigation. But that was not the particularized inquiry that the district court was required to undertake as to Mr. Wu to make any finding of flight. And, again, the government did not subjectively believe he was a flight risk either. So in this case, we would submit that the indictment was improperly sealed. And if there are no questions on that, I will move to our second statute of limitations argument, and this is the improper relation back issue. Now, the government we submit is asking the court to misread or misconstrue the statute of limitations, which says the indictment. And in this case, what we have is a superseding indictment that was filed in Ms. Yang's case. And then the district court related back that superseding indictment to Mr. Wu's case. The government would like the court to say, well, Mr. Wu was on notice. And we understand that notice is the linchpin of the statute of limitations doctrine, at least one of them, along with repose. However, that's a policy rationale, which cannot ever supersede the plain text of the statute. And the superseding indictment was simply not filed in Mr. Wu's case, and therefore it cannot be related back to the indictment against him without contravening the plain text of the statute. And if the court has no questions about that, I will submit on our briefs as to the balance of the argument. Counsel, on the question of the sealed indictment, the failure to read the indictment, what is our standard of review? That would be de novo review, Your Honor, because it is a question of law and a question of statutory interpretation. And do we get to review de novo the government's asserted basis? That is, as to whether Yang and Wu actually were a flight risk? I'm sorry, Your Honor. I misunderstood your question to be about the improper relation back issue. As to the improper sealing, the question is whether the district court abused its discretion. Okay. So that is an abuse of discretion. So where is the abuse of discretion? The district court considered the arguments. Judge Koh did accept that Mr. Wu and Ms. Yang were flight risks and did accept that the government had need for further investigation. So where's the abuse of discretion? Where's the pressure point here that we can reverse that judgment? Well, Your Honor, in crediting the government's assertion that its need to go through these voluminous financial records was a proper prosecutorial objective, that was the abuse of discretion. And that's because there was no real need for secrecy. Wait, but that's the conclusion. Yes. The district court said that there was. The government told the district court that there was. Judge Koh accepted that. So where's the abuse of discretion? What did she miss? Are there facts there that are clear error? Where is the error of law? I understand, Your Honor. And to the extent that there was a precursor factual finding that in fact secrecy was required, I would submit that that should be analyzed on the abuse of discretion prong. Okay. But I'm still trying to figure out in what way did Judge Koh abuse her discretion? She abused her discretion by finding that the facts that the government articulated that they required this additional time in order to review these voluminous records, that this was actually a proper prosecutorial objective, that there was a real need for secrecy. That's the legal standard. She had the facts. Okay. And are you saying that that is not a proper justification if the government can prove it, or are you saying that the government didn't prove it? Even if the government can prove that they spent that time reviewing these financial records, that would be an improper prosecutorial objective. Okay. And what case would tell us that? That would be Bracey, Your Honor. However, I would point out that there is sort of a paucity of circuit-level precedent on this issue. There are numerous district courts that have found that when the government simply affords itself more time to complete its investigation, that that is not a proper and legitimate prosecutorial objective. The government did not seem to approve it. If there's a paucity of circuit court decisions, then in what – you're asking us to decide at this point and in this case that this is an abuse of discretion. That's correct, Your Honor. I think there is enough circuit-level authority, this court's decision in Bracey, this Sixth Circuit decision in Wright, in order for this court to make that determination. And that would go to the question of the government's time that it needed to complete its investigation. What about the flight risk? So the flight risk, there is a clearly erroneous factual finding on the flight risk. The district court did not consider the proper facts. It wouldn't even articulate the proper standard below. There was no individualized fact-finding as to Mr. Wu that he presented a risk of flight. And none of the facts about Mr. Wu and his ties to the community were considered by the district court below. And to follow up with Judge Bybee's question on the additional time to investigate, if it were purely we need additional time to investigate, it seems to me that you're right. But I think the claim was while we're doing the additional time to investigate, we need secrecy. Doesn't that support the district judge's decision? Our contention, Your Honor, is that there was no real need for secrecy here. But the key point then is whether or not there was some need for secrecy. Yes, exactly, Your Honor. The key point is whether there was some need for secrecy. And here we submit that there was not. And the government used this time to review records that were either in its possession or were soon to come into its possession from financial institutions that were bound to respond to its subpoena and to review the contents of the district court. So it sounds like, it sounds to me right that everything turns on whether there was actually a need for secrecy. And would you agree or would it be appropriate for the district court to have looked at whether there's need for secrecy both as to your client but also as to Yang? Because obviously if you do one in one case, it's going to tip off the other defendant, right? So the need for secrecy, you're making the argument that your client wasn't a flight risk, but the district court could rely on the other defendant being a flight risk. Is that correct and that would have been appropriate? Well, I do think that there was a clearly erroneous factual finding in that the court did conclude that Mr. Wu was a flight risk and the court was required to make an individualized determination as to him. As to whether Ms. Yang was a flight risk, I think that that also is an incorrect determination, although that is something that's not exactly squarely before us. I guess what I'm asking is wouldn't it kind of squarely before? Because in order for the district court, the district court couldn't split the baby here, so to speak, right? If the district court was to let one of them go forward but not the other, and if the need was supposedly for secrecy, there would be no more secrecy as to both. They're tied together in that sense is what I'm getting at. Isn't that right? I think that's right, Your Honor. I think that the court had to look at it holistically. I think the larger point that the government was making is that the investors needed somehow to be kept in the dark about the fact of the ongoing investigation, which, again, would not appear to be the case because these records said what they said, irrespective of whether the investors knew about the investigation or not. There was no realistic means for them to obstruct justice, which is what the government— In retrospect, that's obvious. But at the time, it seems like I thought that part of the argument was here in criminal activity, and so you didn't want to tip them off too quickly. Am I wrong in thinking that that was part of the government's concern? No, you're absolutely right, Your Honor. But I assume your position has to be that that was just factually not true either. I'm sorry, what was not true? Your position must be that that was just factually not true either in order for Judge Code to have abused discretion. Because all these reasons have to be just factually not true because all these reasons would support the secrecy rationale, right? There were different reasons, flight risk for either of the criminal defendants here, but also concern about investors that might be criminally involved being tipped off. And if any of those reasons had any factual basis, then it wouldn't be an abuse of discretion. Yes, you're absolutely right, Your Honor. And so your position must be that none of those factual bases have any merit to them. Yes, that is our position, Your Honor. And our position, therefore, is that the government improperly used stealing in order to afford itself more time to investigate the case than Congress afforded it. And that the whole need for secrecy thing was just a sham for the government? Well, that it is a red herring in this case. That if the court endorses it here, that basically there is really no limiting principle because the government can move to steal any time that it would like some more time in order to figure out whether certain participants are co-conspirators or not, that it's too expansive of a reading of this doctrine. That is our position, yes. Well, I think without taking you over, do either of my colleagues, I think we'll add another minute for rebuttal for you also, and then we'll go ahead and hear from the government. Thank you, Your Honor. Good morning, and may it please the Court. Jenny Ellickson for the United States. I'll start with the statute of limitations issue since we're already there unless the Court would like me to move somewhere else immediately. So with respect to the sealing issue, I think if this Court reviews its earlier decision in Bracey, you'll see that that actually supports the district court's decision to seal the indictments here. There was no abuse of discretion. In fact, Judge Koh was extremely careful about making the decision on the defendant's motion to dismiss. The government initially provided a five-page declaration explaining why sealing was necessary here, and Judge Koh was so careful about this that she actually asked the government additional questions. She issued an order saying, I want more information here before I make my final decision. You can find that at document 220 on the docket, her order asking for a supplemental declaration, which the government provided. She had another six-page declaration, and I think if you go through those 11 pages of declaration and then the 17-page order that Judge Koh wrote on the defendant's motions to dismiss, you'll see that she had ample factual support for her determination that legitimate prosecutorial objectives justified sealing here. In particular, with respect to the ongoing investigation, she found and the declarations established that the government was trying to figure out whether these investors who turned out to be victims, whether they were co-conspirators with the defendants, and if the investigation had become known to them, that would have been an issue. They could have potentially destroyed evidence. They obviously were engaged in activities that indicated that they were trying to come to the United States, so it was possible that they were going to be coming to the United States if they didn't know the investigation was happening. But if the investigation became known, then they may change their plans and they might become unavailable to the government. So there was certainly ample factual basis for Judge Koh's careful decision here. If the Court has no more questions on the sealing issue, I would also just quickly like to say, with respect to what my friend on the other side refers to as the relation back issue, the fact that the initial indictment of Mr. Wu was filed in a different case number than the superseding indictment doesn't affect the analysis for purposes of tolling and for the statute of limitations because the initial indictment included the exact charges that the superseding indictment charged him with. It was the same offenses based on the same facts, subjecting him to the same penalties. And so those claims were timely in the initial indictment and the fact that as an administrative matter, the superseding indictment appeared in a different case number doesn't make a difference. From there, I'd like to flip to the mail fraud instructions, which is the Miller issue that Ms. Yang's counsel raised at the outset of his argument. And that's the question of whether there was plain error requiring reversal based on the fact that the District Court did not instruct the jury that intent of fraud means intent to deceive and to cheat, but instead instructed that it means intent to deceive or cheat, which was this court's law at the time. So at the third step of plain error review, the defendants have the burden of showing that there's a reasonable probability that a jury that received the intent to deceive and to cheat instruction would have acquitted them. There is no possibility of that here because the evidence was overwhelming that the entire purpose of the defendant's scheme was to get money from investors. They obtained $4 million at the outset and then an additional $2 million later based on the premise that they were setting up these businesses that would qualify these foreign investors for visas under the EB-5 program, that the investments would be each creating 10 new jobs for qualifying employees in the United States. That was a lie. The defendants created copious documentation that they submitted to the government but also made accessible to the investors that indicated that they were creating these jobs. That wasn't true. These investors had given the money, believing that they were investing in legitimate businesses and that the businesses were going to qualify them for these visas, and the defendants did all of this to obtain the money. I'd like to clarify one point that Ms. Yang's counsel has said both here and in the briefs. This is not a situation where there were only two witnesses showing the intent to cheat that this was a scheme for money. This was throughout the government's presentation. Basically, every witness went to the point that the defendants had been setting up businesses that were fraudulent, that they were telling these lies. The only purpose of these lies was to get money, and it was not just one investor, WZ, who said that he was deceived and gave money because of the deception. There was another investor who testified in the government's case, FY, who said that she believed what the defendants were telling her. She believed her money was going to legitimate jobs, that she wouldn't have given the money if she thought that it was not going to legitimate investments, and that she actually gave them an additional million dollars several years into the process because she believed that it would help, that she believed that the money was still going to where it was supposed to be going. And then with respect to where the money went and the accounting, this isn't a matter of it just going to salaries for people. Money went to Ms. Yang and Mr. Wu's son's college tuition, went to her mortgage. There were about $200,000 spent on fancy hotels and other hotels, $200,000 spent on airfare, including plane tickets to China for their son and for Ms. Yang's 11-year-old daughter with her second husband. And with respect to the idea that all of this was salary for Ms. Yang, the purpose of these investments was to create new jobs. Ms. Yang, you know, she is not a new job to be created. She is not, you know, entitled to pay herself hundreds of thousands of dollars in compensation for something that is not what the investors thought they were doing. They were deceived for the purpose of getting these millions of dollars. I'd next like to turn to the argument that there was insufficient evidence to support the visa fraud camp. Before you go that, what about the argument that whatever this table was or graphic sounds like didn't account for, I think it was Ms. Yang's salary, and, you know, it sort of chopped her salary up into how the salary was spent and so it was deceptive in that sense. I mean, I suppose if I was giving money to a nonprofit nowadays, I'm not saying this was a nonprofit, but I wouldn't be shocked to discover that some of the money was going to administrative costs, you know, which would be Ms. Yang. So why was that not misleading to have, you know, instead of saying this much of the money was going to Ms. Yang? Because maybe that wouldn't have been, it would be harder to argue that that was unexpected and deceptive. Well, so it actually did account for money that went directly to her. I think it was around $225,000 that went directly to her and another $225,000 or so that went to Mr. Wu. That was in the spreadsheet that those payments went kind of directly to their accounts. But then all of this other money, you know, the tuition money, the mortgage, the planes, all of these things, the hotels, all of that, none of that has to do with creating the 10 new jobs. And that was what the investors thought they were doing. And so to the extent that Ms. Yang is now focusing on the fact that the mail-forward accounts don't require the government to show how the money was misappropriated, but that's true. The question is whether they were intending to obtain money. And they clearly were intending to obtain money. They tried to obtain millions of dollars and did obtain millions of dollars from these investors through deception. And that's what really matters. They were trying to cheat them out of this money by saying that they were going to do something with the money and then doing something different with it. And based on those misrepresentations, they got all of that money. Well, in a sense, I guess your argument is it doesn't matter how much they might have spent for tuition or for trips to China or whatever. Even if all of that is sort of off to one side, what they're promised to do is to set up these businesses with 10 employees, and they didn't do it. Exactly. And that's what the evidence, the trial start to finish is about that, about these businesses are fake. They are hiring people for jobs just to have them on paper. They're not giving them anything to do. So it's clear that the money was not going to the businesses, and that was what the investors had signed up for. And so they were, in fact, cheated. And so certainly on the third prong of plain error review, there's no chance that a jury would have acquitted the defendants if they had gotten the intent to deceive or cheat instruction. So if the Court has no further questions on that issue, I'll turn to the visa fraud sufficiency issue, and that relates to the question of whether the government presented sufficient evidence that the defendants made false statements and documents that were required by the immigration laws and regulations. So I know the Court already had a discussion about what the statute means. I will note that with respect to the standard of review, the defendants have raised this statutory argument for the first time on appeal that the term required has to mean exclusively required, that this is the only way to satisfy the requirement. So because that's a new argument in front of this Court, this Court should review it for plain error, but even if it were on a de novo standard, it would not fly. Just with respect to the statutory argument, I would like to point the Court just kind of to reinforce the point that required doesn't mean that it has to be the only way to satisfy that. I'd like to point the Court to the text of the statute in question, which is 1546A. The government charged the defendants under the fourth paragraph of that, which includes the required phrase that we're discussing now, but the second and third paragraphs of that statute also use the word required. They specifically refer to conduct relating to, with respect to an immigrant or non-immigrant visa permit or other document required for entry into the United States, and if you engage in certain conduct with that type of document, you're subject to an offense there. Well, we know that there are a number of different documents you can use to potentially gain entry into the United States, and so the fact that you are dealing with an immigrant visa and you could have potentially had a non-immigrant visa instead doesn't mean that an immigrant visa is not required for entry into the United States. It just kind of confirms that the obvious reading of paragraph 4 is what the government has argued, which is that once the defendants were required on behalf of the investors to provide evidence that they satisfied these job creation requirements, whatever evidence the defendants then decided to use, that was what the statute then required. So if the court has no further questions on that, I'll turn to the guidelines issue. First, with respect to the waiver point, I think that certainly the defendants were arguing that 2L2.1 was the correct offense guideline, and the government originally took a different position below. We said it was 2B1.1. We ultimately went along with 2L2.1 sentencing based on what the district court wanted in discussions with the district court. But in the discussions over the enhancement, the district judge code at that point had repeatedly said, you know, I just really think that 2B1.1 is a better fit for this guideline, for this conduct, which, you know, makes some sense. They obtained millions of dollars. That's something that is contemplated, that 2B1.1 addresses the monetary loss here and the deprivation of the investors. And this court's decision in Wang, which the defendants have cited, that was relating to a different type of mail fraud where the principal victim was actually the United States, not kind of private parties who had lost money. And so I think there was some question about whether the Wang decision actually was going to be controlling here and whether maybe the judge was going to change her mind and go back to 2B1.1, especially because she had repeatedly said that she thought, you know, that seemed like a better fit. And so when the defendants, when Ms. Yang at least made her objection to the application of this enhancement, the judge code went back to that larger question. Well, doesn't this mean, doesn't this go to the larger point and doesn't this just go to show that this is really, you know, it seems like you're making an argument that's inconsistent with your position that this is the correct guideline if you're saying that this doesn't exactly fit. And, you know, I think the court can look at the transcript, but I think a plain reading of the transcript, I think it's a fair inference that it was a strategic decision on the part of Ms. Yang's counsel to try to secure the benefit, the substantial benefit, of the 2L2.1 offense guideline, which resulted in a substantially lower guidelines range than the 2B1.1 would have even with this enhancement. And they did not want, you know, bird in the hand is much better, and so they made a strategic decision. And so I think in that respect, this was waived by Ms. Yang. But even with respect to the merits, if you look at the plain language of this guideline, it fits the conduct here, and the judge appropriately applied it. Let me be clear with you. So the government's not taking a position that, putting aside what happened in this case, the whole thing you just described, it would be possible to say, I, and therefore waive a challenge to the 2L2.1 to use the guideline. I agree that it's 2L2.1, but disagree with the enhancement, right? Yes. And so you're not saying that they kind of must travel together. They must travel together. Yeah, no, not at all, certainly. And I think, you know, what initially happened in Ms. Yang's sentencing is that they said, we want the offense guideline, we don't want the enhancement. And the judge started to signal, I think, that she thought, in her view, based on looking at the text of the guidelines, that if she is applying 2L2.1, that ---- Yes, your view is that when it looked like the judge, if you weren't going to accept the enhancement, when it looked like the judge might just throw out 2L2.1 and go to something else that was less favorable, then they acquiesce to the enhancement is your view. Yes. Not that you necessarily have to travel together, but that's what I'm saying. Right, so that it was a strategic decision to stop arguing the point with respect to the enhancement. And I think it was not a bad strategic decision, potentially because it resulted in a lower guidelines range. But it was something that, you know, I think once they backed off of that, if they weren't going to die on that hill, I think it ---- So assuming that they haven't, that Ms. Yang has not waived this question, how do you get through B3? Yes, so the language of B3 is, I think, pretty squarely applicable here. So the question is whether the defendant knew, believed, or had reason to believe that a passport or visa would be used to facilitate commission of a felony offense. So the felony offenses here are the mail fraud offenses, at least that's the district court specifically mentioned the mail fraud offenses, where they were getting the money from these investors. And they used both visas and passports to further that deception. But by sort of holding them out as the end result of this, is that sufficient? I mean, it wasn't that they were issued visas or passports in this case. No, actually there were, Your Honor. The record in this case is very complicated, so let me kind of walk through exactly how this worked. So the EB-5 visa application process, as relevant here, there are basically two stages of the process. The first stage of the process is the 526 process, where you have to say, I've made an investment in a company and I expect that it's going to create these ten jobs. After you get that through, if that gets approved, you get a visa. You get an EB-5 visa and conditional permanent residency as a result of that visa. And so then you have to go to the next step of the process, which is the 829 petition process. And that's where you actually have to show that you created the jobs, and that's usually several years later. But the investors, five of the investors that we're talking about here, they cleared the 526 process. They got visas based on the defendant's representations about their businesses and the defendant's claims about how they were going to create jobs. So what happens basically is that this showed, I think, would have demonstrated to the investors, oh, I'm in with the right people. They're doing what I think they're doing with my money. I don't have to check on where my money is going. I don't have to try to get my money back. In fact, two of the investors gave more money, $2 million, later down the road after they'd already filed their 829s. And I think it's because the fact that they had successfully gotten visas with the help of the defendants, or so they thought, bolstered the defendant's credibility and enabled the defendants to continue this deception about what they were actually doing that needed to be done. So I see your argument. Is the government's argument that, I mean, under your interpretation would it always be true that anybody who is facilitating fraudulent, and here the fraud is on the people helping facilitate, not necessarily the people on the other side, but anybody facilitating fraudulent receipt of immigration documents, visas or passports, that if they are charging somebody for that, which would almost always be a separate crime, then that would be some sort of fraud, like mail fraud or wire fraud or something, that if that's the case, then this would always apply? Or is there some limit to? Yeah, your Honor, that's a good question. I'm not entirely sure exactly what the outer limits would be for this type of theory, but I think if what you have here, it isn't just a matter of kind of selling the visas. This was part of the whole scheme. Yeah, it seems to me like your argument is that there's a whole scheme and there's multiple steps to the scheme, and this was to help you have the first thing they do, which violates, which is getting them the visa here, and that's enough. But I'm just trying to figure out, you know, what about just the person that's just trying to get somebody a visa or a passport, a legitimate visa or passport, but through fraudulent means, by lying to the government, but they're doing it for money. Are they always going to be subject to this enhancement or not, under your interpretation? Yeah, I guess I would have to… But then the only people that wouldn't be subject to it would be, like, if I was trying to get it for my sister or something, out of the goodness of my heart. I just wasn't, but I don't know how often. It seems like this enhancement would almost always apply under that interpretation. Well, I guess I don't know if you're kind of obtaining a visa through fraudulent means and then you're selling it to somebody. I'd have to do research to see whether selling it to somebody would be the commission of another. It has to be a non-immigration offense. And so if you're selling a visa to somebody that's a fraudulent visa, I think maybe that would fall into the category of being an immigration-related offense. It could also probably be charged as some sort of fraud, like wire fraud or something, I'm thinking. So it could be… Well, I guess I'd have to think about it more. But this case, I think, is much more heartland. Your argument here relies, you're saying it's not that simple. Here they've got a lot more of the fraud going on. Yes, and also I see that I'm actually over time. If I could finish. Yeah, please. No, I mean… Yeah, so it's also not just the visas. There's also the passports that the defendants relied on, and these were included in the actual 829 submissions themselves. And this was because the investors had to show that their jobs were going to qualifying employees, which means employees authorized to work in the United States. And so to satisfy that requirement, the defendants were often providing copies of passports to say, look, this person is authorized to work in the United States. You can see their passport is here. And so by including that evidence in the actual 829 packet, the 829 packet, which is the subject of the mailing, that's the basis for the mail fraud charges, and they were able to get other attorneys to put their names on this, to act as the attorneys on this, partly, I think, because they looked on the surface like they were legitimate packages. So it really goes to the very core. There's a close connection. I see that I'm over my time. I'm happy to answer any other questions the Court may have. I think you've hit the high points from my perspective. Thank you very much for your conference. And we'll go ahead and have rebuttal starting with Wu's attorney. Thank you, Your Honor. Unfortunately, my colleague raised a number of new arguments and rotted her briefs, but I'll do my best in the minute that I have here. On the mail fraud, I think the most important thing I would point you to is the jury acquitted Ms. Yang of money laundering. One of the underlying requirements of money laundering is that the money is proceeds of a crime, and in that case it was money spent on her house. So we do know that the jury did not buy the government's misappropriation theory, at least as to those two counts. And there's a good reason for that, Your Honors. The businesses here were very unsuccessful businesses, much like many businesses in Silicon Valley. They did not earn a profit. And, frankly, I think Ms. Yang would be the first to admit she didn't do a good job. But they were businesses that had employees, that paid salaries, and that provided services. And, in fact, there was one— But let's just be clear. Yes, Your Honor. So this is on the deceive and cheat. Yes, Your Honor. And your view is that the jury here—you just disproved the government. The jury here could have concluded that they cheated, that they deceived, but it was all in the service of a legitimate business purpose. And so, therefore, they did not cheat them out of the money. They just deceived them. I would put it slightly differently, Your Honor. So the main theory the government had at trial was that there was deceit because they lied on a visa application. The alternative theory was that there was deceit and cheating because they cheated the investors out of the money. So, in our view, the jury could have found, yes, there were false statements on the visa form, which is what the government urged them to do in the rebuttal to closing, but not found also that those were done with the intent of cheating the investors out of their money because they were legitimate businesses. They weren't successful ones, but they were legitimate. That's what I was trying to say. I think you said it better than I did. All right. Your Honor, I'm out of time. No, no. Go ahead. Briefly. Yeah, I'd like you to go ahead and address the sentencing. I think I jumped on you a little quick when you started, and I think maybe I misunderstood, but I've got a little more clarity. So maybe you want to address what the government said. Yes, I do want to address the waiver point. So I think, unfortunately, the government didn't brief Wing, so this is the first time I'm hearing her arguments about it. But that case, I would just refer Your Honors to it. It's incredibly clear that when there is conduct that qualifies under the visa fraud statute, then the visa fraud guidelines apply. And it actually lays out the elements of the visa fraud statute and matches them up to the facts of that case. Here there was a conviction under the visa fraud statute, so the same underlying conduct existed. And in light of that case, which we did cite in our briefing to the district court, she had no choice. We would have come up here and we would have said, look, Your Honors, it's as plain as day. And I think it's telling the government didn't brief the issue because they knew they didn't have an argument. Wing was never mentioned at the hearing. And, Your Honor, the last thing I do want to make, so there could be no tactical advantage because the law was crystal clear on our side. And you can read the opinion if you disagree, so be it, but please do read the opinion. The last thing I have to point out is that all the analysis that she just gave on facilitation, none of that happened at Ms. Yang's hearing. At Ms. Yang's hearing, there was none of this explanation about the visas and the passports. That only happened at Mr. Wu's hearing, which was a separate hearing. Ms. Yang wasn't there. Her counsel wasn't there. It was later in the day. It was a Zoom proceeding, so they all actually had to call in. So there's no reasoning like that in our case. And I'm not aware of any case that says a judge can rectify a mistake with a different defendant based on her analysis in a later ruling. So in that case, I would suggest that cast her upon supply. She didn't make the required finding of facilitation, and, therefore, the enhancement should be vacated. Of course, if you find for mail fraud, you don't need to get to that, and it also knocks out their conspiracy count. Your Honors, you've been very generous in your time. I don't want to take you over. Happy to answer any other questions. Any more questions? All right, well, thank you, counsel. We'll move on. Our final counsel will be Ms. Yang's counsel. Thank you, Your Honors. So the government explains that this supposed separate felony that would support the facilitation enhancement was the mail fraud offenses. And I wanted to be very clear about exactly what the mail fraud offenses charged. If you look at Count 5, it says that Mr. Wu used the mail as, quote, for the purpose of illegitimately acquiring immigration benefits under the EB-5 visa program. So that is very much visa fraud for the purpose of acquiring a visa, to which one is not otherwise entitled. And that is why the 2L2.1 guideline did apply. Wang is also certainly exactly on point, and Wang was a plain error review case. So it would have been plain error review, as my colleague just stated, for the court to have applied a different guideline. And it's for that same reason that punishing the same – it's the same scheme, the same course of conduct, illegitimate acquisition of EB-5 visas that these persons were not entitled to have because of the false statements in the visa applications. That same course of conduct is what the government has been also pointing to to say that the facilitation enhancement applies. And that is punishing the same poor offense conduct twice. And I think for that reason, the government had a very difficult time in responding to Judge Van Dyck's question, you know, what is the limiting principle here? When someone receives money for visa fraud or for creating fraudulent passport, when would the facilitation enhancement not apply? You know, the government couldn't answer that question. There is one answer to that, which is if you didn't do it for money, right, which happens sometimes, right? You're just – you're doing it for family or something, and you're doing it for free. But that would be one example when it wouldn't happen. I'm just curious as to if there's any other limiting principle. Sure. And the government wasn't able to articulate one. And in this case, we certainly do have a whole course of conduct that the government – well, the district court punished twice, and what the government has been asking. I think your positions are basically it has to – it would have to be to commit a felony that was unrelated or at least was something additional to fraud or trying to make money. It would like to go commit a terrorist act or something like that. It would have to be a felony that the 2L2.1 is not already accounting for. That's where the double counting comes from. The reason that it's already accounted for there is that the reason we're in 2L2.1 land at all is that the mail fraud offenses stated a visa fraud offense. It was use of the mails to mail a fraudulent visa. So use of the mails in furtherance of visa fraud offense. That's what gets us to 2L2.1, and that's the heartland of the guideline, and that's why the offense was punishable under this guideline. And I appreciate that the district court expressed frustration with the fact that the guidelines range was then low, but the court had discretion to depart upwards. I think it's telling that even the district court at Mr. Wu's sentencing hearing went so far as to say, I agree with you. This really doesn't apply, but it's inconsistent for the defense to say, I want 2L2.1, but all these enhancements don't apply. Well, it wasn't inconsistent. 2L2.1 did apply as a matter of applying the correct guideline, as a matter of statutory interpretation, also under this court's precedent, and the guideline enhancement didn't apply, and the district court certainly had discretion to reach the appropriate sentence through different means. I think we're quite a bit over, but let me check with my colleagues to see if we've got any additional questions. All right. Well, again, thank you very much for your very helpful arguments this morning, and this completes our sitting, and the court will be adjourned until tomorrow. Thank you. All rise.
judges: FLETCHER, BYBEE, VANDYKE